### COMMISSIONER OF INTERNAL REVENUE v. SHILLITO REALTY CO.

### SAME v. JOHN SHILLITO CO.

Nos. 5402, 5403.

Circuit Court of Appeals, Sixth Circuit.

April 10, 1930.

N. D. Keller, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, C. M. Charest, and Percy S. Crewe, all of Washington, D. C., on the brief), for petitioner.

J. H. Head and J. S. Graydon, both of Cincinnati, Ohio (Maxwell & Ramsey, of Cincinnati, Ohio, on the brief), for respondents.

Before DENISON and HICKS, Circuit Judges, and JONES, District Judge.

JONES, District Judge.

By petitions to review, the Commissioner of Internal Revenue challenges the correctness of. the decision of the Board of Tax Appeals finding the respondents to have been affiliated corporations during the fiscal years 1918, 1919, and 1920. Whether the facts support the Board's order is the sole question. The facts not being materially in dispute, decision turns upon the meaning of section 240(b) of the Revenue Act of 1918 as applied to the relationship of these two respondent corporations.

The John Shillito Company, referred to hereinafter as the store company, was organized under the laws of Ohio on June 22, 1882, with an authorized capital stock of $2,000,000, consisting of 20,000 shares of common stock of $100 par value per share, which was issued to acquire the business of its predecessor partnership established in 1830. It conducts a retail department store. In 1914 it caused to be incorporated the Shillito Realty Company; hereinafter referred to as the realty company, for the purpose of converting a portion of its fixed assets into liquid working capital. The authorized capital of the new corporation was $1,200,000, divided equally into preferred and common stock, both with full voting power. To this company the store company deeded its land and buildings used for store purposes, receiving in payment therefor $600,000 in cash and all of the common stock of the realty company of the par value of $600,000. The cash payment was from money secured from the sale of the preferred stock of the realty company to stockholders of the store company and to others. Thereafter the realty company made a perpetual lease of the property to the store company at an annual rental of $72,000 and the payment by the lessee of all taxes, insurance, assessments against the property, and all other operating expenses of the lessor. An option to repurchase the property after ten years, for $1,-200,000 was provided in the lease. Upon formal request of the store company, the realty company reduced the annual rental to $36,000 on June 25, 1918. The only business of the realty company was the ownership of the property used by the store company, the collection of the rental therefor, and the declaration and payment of dividends solely out of the money received as rent under the lease. Its office was in the office of the store company. Its officers and directors were at all times the nominees of Stewart Shillito, president of both companies. At

each stockholders' meeting, the stock of the minority interests was voted by proxies given to a committee of which John Shillito was chairman. During the time in question, the store company directly owned all of the 6,000 shares of common stock of the realty company, and of the 6,000 shares of preferred stock outstanding 1,862 shares were owned by stockholders and officers of the store company. Thus the store company and its stockholders and officers owned approximately 66 per cent. of all of the outstanding stock of the realty company, common and preferred. The remaining 34 per cent. of the total amount of stock was all preferred stock. Of this 34 per cent. approximately 15 per cent. was owned or held by employees of the store company and approximately 11 per cent. was owned by business associates of Stewart Shillito, president of both companies, and who owned 55 per cent. of the stock of the store company.

Section 240(b) of the Revenue Act of 1918 (40 Stat. 1082) provides as follows: "For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests."

The Commissioner contends that the relationship of these two corporations cannot satisfy the test of either statutory definition of affiliated corporations authorized to file a consolidated return, and that "stock control" means something more than is presented by the ownership and control shown here. But we think the question largely turns on the character of the preferred stock of the realty company and also the status of the 34 per cent. of such stock which may be said to be outside owned.

That ownership or control of substantially all of the stock contemplates domination by virtue of stock rather than by management or majority is not to be disputed in the face of the plain words of the statute. But the stock that controls is the stock that has the power to dominate the business and the voting strength to make that domination effective. If such a situation exists, you may have a business unit and affiliated corporations within the meaning of the statute. In addition to the ownership and control of the stock as disclosed by the facts in this case, the realty company was a creature of the

store company, and was dominated by the latter in such manner that no diversity of interest could materially affect its control or management. The only purpose of its existence was to promote the interests of the store company, no more. No considerable amount of stock was in the hands of what might be called outside interests, or in the hands of those who, if hostile or adverse, could materially affect its control, operation, or management. No possible adverse interest may be perceived in the ownership of outside preferred stock. The relationship and mutual dependency of the two companies was such as to effect a complete unity of interest and enterprise. The corporate activity of the realty company was non-existent save for purposes of the store company. It was a single business enterprise. It is true that the preferred stock had voting rights, but to what purpose? It could neither increase its dividend nor redeem itself, nor influence the policy or purpose of its management. At the request of the store company, the annual rental provided by the lease was reduced one-half by the realty company.

We think the term "stock," as used in the statute, is clearly intended to mean stock with a potential voting power which, if asserted, will be effective in the management or control of the corporation. This preferred stock was so hedged with limitations that it was ineffective in respect to any control or domination. Its annual dividend of 6 per cent. was fixed. It was to be paid in full on liquidation, and was redeemable at the option of the store company, after 1924, for $105 per share. The preferred stock bore no burden of taxation and exercised no voice in the management or policy of the company, nor did it have any hazards or benefits to be reckoned with in the return of income for taxation. Its redeemability gave it the color of indebtedness.

We think this case stronger on the facts than Great Lakes Hotel Company v. Commissioner (C. C. A.) 30 F.(2d) 1.

The ownership of stock which may vote, but not be effective in control, can have but little influence in the domination of the corporation. Substantially all of the stock which was effective in control was owned or controlled by the same interests. For practical purposes, the ownership or control of the 34 per cent. of preferred stock of the realty company was so ineffective in control as to be disregarded. The meaning of the words "substantially all the stock," urged

by the Commissioner here, is not exactly that which his regulation interprets it to be. Article 633 of Regulation 45, printed in the margin,[1] provides that "the words 'substantially all the stock' cannot be interpreted as meaning any particular percentage, but must be construed according to the facts of the particular case. * * * Consolidated returns may, however, be required even though the stock ownership is less than 95%. When the stock ownership or control is less than 95%, but in excess of 50%, a full disclosure of affiliations should be made, showing all pertinent facts, including the stock owned or controlled in each subsidiary or affiliated corporation, and the percentages of such stock owned or controlled and the total stock outstanding."

The reasonable view of the Commissioner's regulation, it seems to us, is that it depends in each case what the pertinent facts are, if less than 95 per cent. but more than 50 per cent. In other words, stock ownership or control in excess of 50 per cent. may satisfy the test of the statute if the facts of affiliation are sufficient to show effective stock control. We think the cases of Ice Service Company v. Commissioner (C. C. A.) 30 F. (2d) 230, and Commissioner v. Adolph Hirsch & Company, Inc. (C. C. A.) 30 F. (2d) 645, are distinguishable from the case here on the facts because of the nature of the minority interests in the subsidiary companies in those cases and the possibility of burden or benefit to them arising from the filing of a consolidated return. The underlying purpose, of course, in each case of income taxation, is to get at the true net income, and this purpose extends to a single business enterprise operated through more than one corporation. See article 631 of Regulation 45 and Senate Finance Committee Report No. 617, printed in the margin.[2] In

---

[1] Treasury Department Regulations 45 (1920 Ed.): "Art. 633. *When corporations are affiliated.*—Corporations will be deemed to be affiliated (a) when one domestic corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (b) when substantially all the stock of two or more domestic corporations is owned or controlled by the same interests. The words 'substantially all the stock' cannot be interpreted as meaning any particular percentage, but must be construed according to the facts of the particular case. The owning or controlling of 95 per cent. or more of the outstanding voting capital stock (not including stock in the treasury) at the beginning of and during the taxable year will be deemed to constitute an affiliation within the meaning of the statute. Consolidated returns may, however, be required even though the stock ownership is less than 95 per cent. When the stock ownership or control is less than 95 per cent. but in excess of 50 per cent., a full disclosure of affiliations should be made, showing all pertinent facts, including the stock owned or controlled in each subsidiary or affiliated corporation and the percentage of such stock owned or controlled to the total stock outstanding. Such statement should preferably be made in advance of filing the return, with a request for instructions as to whether a consolidated return should be made. In any event such a statement should be filed as a part of the return. The words 'the same interests' shall be deemed to mean the same individual or partnership or the same individuals or partnerships, but when the stock of two or more corporations is owned or controlled by two or more individuals or by two or more partnerships a consolidated return is not required unless the percentage of stock held by each individual or each partnership is substantially the same in each of the affiliated corporations."

[2] Article 631 of Regulation 45 (1918 Ed.): "The provision of the statute requiring affiliated corporations to file consolidated returns is based upon the principle of levying the tax according to the true net income and invested capital of a single business enterprise, even though the business is operated through more than one corporation. Where one corporation owns the capital stock of another corporation or other corporations, or where the stock of two or more corporations is owned by the same interests, a situation results which is closely analogous to that of a business maintaining one or more branch establishments. In the latter case, because of the direct ownership of the property, the invested capital and net income of the branch form a part of the invested capital and net income of the entire organization. Where such branches or units of a business are owned and controlled through the medium of separate corporations, it is necessary to require a consolidated return in order that the invested capital and net income of the entire group may be accurately determined. Otherwise opportunity would be afforded for the evasion of taxation by the shifting of income through price fixing, charges for services and other means by which income could be arbitrarily assigned to one or another unit of the group. In other cases without a consolidated return excessive taxation might be imposed as a result of purely artificial conditions existing between corporations within a controlled group."

Senate Finance Committee Report, No. 617, 3d Sess. 65th Cong. 1918-19, Senate Reports, vol. 1, Misc. 1, pp. 8, 9: "Moreover, a law which contains no requirement for consolidation, puts an almost irresistible premium on a segregation or a separate incorporation of activities which would normally be carried as branches of

the latter reference it will be noted that in the opinion of the Senate Finance Committee the provision of the law for filing consolidated returns which would operate to prevent tax evasion was also open as a privilege to escape unjust tax burdens when there was in reality a business unity, although comprised of two or more affiliated corporations.

The orders of the Board of Tax Appeals are affirmed, and the petitions of the Commissioner dismissed.

one concern. Increasing evidence has come to light demonstrating that the possibilities of evading taxation in these and allied ways are becoming familiar to the taxpayers of the country. While the committee is convinced that the consolidated return tends to conserve, not to reduce, the revenue, the committee recommends its adoption not primarily because it operates to prevent evasion of taxes or because of its effect upon the revenue, but because the principle of taxing as a business unit what in reality is a business unit is sound and convenient, both to the taxpayer and to the government."