JAMES L. PICKERING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pickering v. Commissioner
Docket No. 6760-75.
United States Tax Court
T.C. Memo 1978-427; 1978 Tax Ct. Memo LEXIS 89; 37 T.C.M. (CCH) 1765; T.C.M. (RIA) 78427; October 26, 1978, Filed *89 Petitioner's allowable losses from vandalism determined. James L. Pickering, pro se. Kenneth Bersani, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioner's 1973 income tax of $ 927.26. The only issue for our decision is whether petitioner is entitled to casualty loss deductions of $ 1,000 and $ 3,000 under section 165, I.R.C. 1954, [1] as a result of two break-ins to his rental property during 1973.
FINDINGS OF FACT Petitioner James L. Pickering resided in Chaffee, N.Y., when he filed his petition. Petitioner timely filed a joint income tax return for 1973 with his wife, who is not a party to this case, with the North Atlantic Service Center, Andover, Mass.
During 1973 petitioner owned a two and one-half story frame dwelling on a lot 25 feet by 112-1/2 feet at 203 Hamburg Street, Buffalo, N.Y. The Hamburg Street property contained three rental units: A front downstairs apartment, an upstairs and downstairs rear apartment, and a front upstairs apartment. Petitioner *90 acquired the Hamburg Street property by gift from his wife's aunt, Mary F. Smietana on September 27, 1967. The deed of transfer stated a consideration of "$ 1.00 and no more." However, upon the request of Mary F. Smietana's lawyer petitioner paid back property taxes on the Hamburg Street property totaling $ 240.86. Mary F. Smietana had acquired the Hamburg Street property by devise under the will of her mother, Maryanna Smietana, who had purchased the property in 1925. Mary F. Smietana received the property on or about May 26, 1962, the date of her mother's death. According to an appraisal of Maryanna Smietana's estate made on December 6, 1962, the fair market value of the Hamburg Street property was $ 8,500. The appraisal was done primarily for the purpose of determining whether the estate was subject to New York estate taxes. No division was made between the value of the building and the underlying land. (Subsequent real estate tax assessments also have not been divided between the building and land.) While the Hamburg Street property was in Mary F. Smietana's hands different apartment units were rented. The rear apartment was rented throughout 1962 to 1967, the front upstairs *91 was rented for the early part of this period, and the front downstairs apparently was vacant. Also, while the Hamburg Street property was in Mary F. Smietana's hands the only capital improvements made to the property by Smietana were the installation of a shower in the apartment and of three bathroom fixtures (apparently a toilet, bathtub and sink) in the rear apartment. When petitioner acquired the Hamburg Street property in 1967, only the rear apartment was being rented, and petitioner immediately began renovating. All the work was performed by petitioner and his family. None of those who helped petitioner charged him for their services. Petitioner made the following renovations to the front downstairs apartment between 1967 and 1969: (a) Because of their deteriorated condition, he removed and replaced the ceilings in two bedrooms and the bathroom. He also removed two walls entirely to make a larger bedroom and larger bath. The original plaster walls were replaced with plaster board. (b) In the rear of the apartment two doorways were walled over with two-by-fours and plaster board to comply with the City of Buffalo Housing Code. All electrical fixtures were replaced with updated *92 equipment. Several window panes were replaced and in one instance an entirely new window frame was installed. (c) The bathroom, after the new walls were put in, was completely refurbished. New floor and wall tiles, plumbing, fixtures (including a new toilet, bathtub, and sink), electrical fixtures and outlets, and window panes were installed. Insulation was placed in the external wall of the bathroom. (d) In the bedroom electrical fixtures and outlets were installed and a cracked window was fixed. (e) In the kitchen-dinette area, a gas heater was repositioned and new fire-retardant material placed underneath. The gas line to the heater was recaulked to seal leaks. New plaster board and electrical fixtures and outlets were installed. A new sink was put in. The doors were refinished with fire retardant tempered masonite. Door frames were installed on all doors. (f) In the back hall leading from the downstairs apartment the walls were fire-retarded as were the ceilings, walls, and floor of a large closet located under the rear stairs. (g) New locks were placed on the front and rear doors. The front steps were reconstructed. New shutters were placed on all windows. Most, if not *93 all, of the rear apartment also was repainted. Following are the renovations petitioner made in the front upstairs apartment between 1967 and 1969: (a) A new water tank was installed. A bedroom was converted into a bathroom. All new fixtures were installed (including toilet, bathtub and sink). Piping was run from the water tank to the new bathroom. A new sewer line was installed from the bathroom to the basement. A special section of wall was installed around the new tub. New insulated copper piping was installed for all the fixtures. (b) The walls of all the other rooms were repainted. (c) New drain lines were installed under the kitchen sink. (d) One pane of a storm window was replaced with an extra pane that had been stored in the basement. (e) Some electrical fixtures and outlets were replaced.
(f) The attic door was fire retarded. In the upper rear apartment these renovations were made between 1967 and 1972: (a) A new doorway was cut so that there would be two entrances. A new door and frame were installed and the plaster surrounding the doorway refinished. (b) In the rear of the house a new chimney was built up to five feet above the roof.The chimney connected to a new *94 boiler that was installed in the basement. The baseboard heat was repaired. (c) Many electrical fixtures and outlets were replaced. The gas and water pipes in the kitchen were repaired. A gas heater was installed. (d) Two broken windows were replaced. (e) Several pipes in the bathroom were replaced because they had rested out. Petitioner spent $ 4,500 altogether in making these renovations. On or about February 3, 1973, individuals broke into the Hamburg Street property and vandalized the front upstairs apartment, breaking windows and shooting a bow and arrow in the apartment. On or about February 4, 1973, a fire occurred in the front upstairs apartment of the Hamburg Street property, causing damage to a stuffed chair, paneling, framework around the doors, and the floor.
On or about June 6, 1973, individuals again broke into the Hamburg Street property and vandalized all the apartments, breaking the remaining windows, door panels, ripping piping out of the walls, and smashing all the circuit breakers. In late February 1973 the City of Buffalo began a proceeding to have the Hamburg Street property demolished because of housing code violations. Sometime in 1974 petitioner consented *95 to demolition of the building. It later was demolished. Petitioner made no repairs to the property following the fire and vandalism losses. The property remained untouched until it was demolished. Nor did the petitioner have an independent appraisal made of the damage before the property was demolished. During 1973 the assessed value of the Hamburg Street property (land and improvements) was $ 2,800. At this time the equalization rate for the City of Buffalo was 54 percent. Petitioner claimed a casualty loss of $ 5,000 on his 1973 income tax return, $ 1,000 for the first vandalism damage, $ 1,000 for the fire damage, and $ 3,000 for the second vandalism damage. In the notice of deficiency respondent disallowed the entire amounts claimed for losses from vandalism but did not disallow the claimed fire loss. ULTIMATE FINDING OF FACT Petitioner sustained vandalism losses of $ 250 and $ 1,500 as a result of two separate break-ins at the Hamburg Street property in 1973. OPINION Petitioner claims he is entitled to deductions of $ 1,000 and $ 3,000 for casualty losses under section 165(a) and (c) as a result of two acts of vandalism to his Hamburg Street rental property in 1973. Respondent *96 concedes that vandalism damage constitutes a casualty but argues that petitioner has failed to prove the factual elements of a loss. Specifically respondent contends that petitioner has not established the nature of his losses, the amount of the losses, or his adjusted basis in the loss property. Since these are factual issues respondent is correct that petitioner bears the burden of proving that respondent's determination was wrong. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). Respondent's concern with the nature of the loss is easily disposed of by our finding that vandalism resulted from the break-ins during 1973. Although conceding that the break-ins occurred, respondent contests the fact of vandalism because petitioner did not have an independent individual testify with regard to the property's damage and the property apparently was demolished by the City of Buffalo before petitioner's 1973 return was audited. Petitioner, appearing pro se, did not foresee this problem of proof and offered only his testimony and his son's testimony with regard to the nature of the loss. Disinterested testimony, though helpful to the fact *97 finder, is not required to substantiate a loss. Keith v. Commissioner,52 T.C. 41, 49-50 (1969). We found petitioner's testimony to be candid, forth-right, and credible. According to petitioner, the February 1973 break-in resulted in broken windows and damage caused by bow and arrow in the "upstairs apartment"; [2] a short time later, there was a fire that damaged primarily a stuffed chair, paneling, framework around the doors, and the floor, all in the "upstairs apartment"; but the major damage was done during the June break-in--throughout the building (1) the vandals had taken a sledge hammer and broken every window, every door panel, and every panel between the studs; (2) they had ripped piping out of the walls; (3) they had smashed all the circuit breaker panels, and some circuit breakers were stolen. We accept petitioner's testimony that he sustained losses in 1973 as a result of two acts of vandalism. [3] *98 The amount of a casualty loss sustained is measured by the difference between the fair market value of the loss property immediately before and after each casualty, limited to the adjusted basis of the loss property. Sec. 1.165-7(b)(1), Income Tax Regs. Two methods of valuation are endorsed by the regulations to measure the loss in fair market value. One is by appraisal and the other is by the cost of repairs. Sec. 1.165-7(a)(2), Income Tax Regs.
Petitioner, a licensed master electrician with some casual construction experience, tried to establish the amount of his vandalism losses by giving his opinion of the cost of repairing the damage. Section 1.165-7(a)(2)(ii), Income Tax Regs., provides that the cost of repairs to the property *99 damaged is acceptable as evidence of the loss of value if, among other requirements, "the amount spent" for such repairs is not excessive, and the value of the property "after the repairs" does not exceed the value of the property immediately before the casualty. These requirements have been interpreted to mean repairs and expenditures must actually be made to use the cost of repairs method to ascertain the amount of loss. Farber v. Commissioner,57 T.C. 714 (1972); Lamphere v. Commissioner,70 T.C. 391 (1978). We therefore cannot consider petitioner's estimated cost of repairs to determine the amount of loss. According to section 1.165-7(a)(2)(i), Income Tax Regs., in determining the amount of loss the fair market value of the property immediately before and after the casualty "shall generally be ascertained by competent appraisal." [4] Petitioner did not have an independent appraisal made of the loss property at any time in 1973 and his own testimony did not center on the pertinent fair market values of the property. Nevertheless, it is apparent that petitioner suffered some loss as a result of the break-ins. As such, we feel compelled to approximate the amount thereof from other *100 facts of record in accordance with our best judgment. See Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930); cf. Millsap v. Commissioner,46 T.C. 751, 760 (1966), affd. without discussion of this issue 387 F. 2d 420 (8th Cir. 1968), wherein we observed: There have been cases where a failure of proof on the issue of basis has been overlooked to permit the allowance of a small casualty loss deduction where it could reasonably be inferred from other facts of record that the allowed amount did not exceed basis * * *. The record clearly shows extensive damage to the windows, doors, and walls as a result of the acts of vandalism. Bearing against petitioner because his inexactitude is of his own making, we find that the loss in fair market value as a result of the vandalism in February *101 1973 was $ 250 and as a result of the vandalism in June 1973 was $ 1,500. We believe there can be little doubt that the windows, doors, and walls destroyed were worth $ 1,750. The evidence is insufficient to establish any further loss. The final element of a casualty loss deduction is the adjusted basis of the loss property. Under section 165(b) and section 1.165-7(b)(1), Income Tax Regs., the loss sustained is deductible only up to the adjusted basis of the property for determining loss from the sale or disposition of the property. Numerous uncertainties preclude an exact determination of petitioner's adjusted basis in the loss property from the record in this case. Petitioner apparently acquired the property by gift (or net gift, since he paid back property taxes), so his starting basis would be the lower of the donor's basis or the property's fair market value at the time of the gift. Sec. 1015. We have no evidence of the property's fair market value at the time of the gift. The only evidence we have with respect to the donor's (Mary F. Smietana) basis is that she inherited the property in 1962 and that it was appraised at that time at $ 8,500. See section 1014 for basis *102 of inherited property. We have no evidence of the breakdown between land and improvements and no means of determining allowable depreciation subsequent to 1962. These gaps in the evidence prevent petitioner from relying upon his starting basis to support his losses in this case. Millsap v. Commissioner,supra.
Still, additions to petitioner's basis in the building after his acquisition of it convince us that there was sufficient basis to allow a deduction for the losses we have found were sustained. Petitioner testified that his out-of-pocket investment in the capital improvements to the building from September 1967 to 1972 was $ 4,500, [5] a fact conceded by respondent on brief. This increases the basis of the building. Sec. 1016(a)(1). Basis also must be reduced for the greater of depreciation allowed or allowable. Sec. 1016(a)(2). In addition to several years of depreciation, basis must be reduced by the fire loss allowed in 1973 to determine the adjusted basis as of the time of the second vandalism loss. In the absence of evidence concerning the depreciation of the building, [6] petitioner has not established his exact adjusted basis. Nevertheless, we believe the evidence *103 establishes that there was sufficient remaining basis as of 1973 to permit a deduction for the $ 1,750 in vandalism losses sustained. Starting with the $ 4,500 in improvements, and reducing that by the $ 1,000 fire loss allowed by respondent, petitioner's basis before depreciation adjustments as of 1973 was $ 3,500. Our judgment is that at least half of this amount must have remained undepreciated--petitioner had held the building for only 5-6 years--and thus petitioner's adjusted basis in the building was sufficient to permit allowance of the $ 250 and $ 1,500 losses we have found were sustained. Decision will *104 be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue, unless otherwise indicated.↩
2. Petitioner's reference to the "upstairs apartment" apparently is to the front upstairs apartment. ↩
3. Petitioner's testimony is consistent with complaints he filed with the City of Buffalo police and with his prior testimony in a proceeding brought by the State of New York to have the Hamburg Street property demolished because of housing code violations. Also, an inspector's testimony at that proceeding generally corroborates petitioner's testimony here. We do not, however, rely on the testimony of petitioner's son, Jonathan E. Pikering. Jonathan testified that he never had told petitioner that he had seen any damage at the Hamburg Street property until the day of trial itself. This casts doubt upon the accuracy of his testimony.↩
4. This is not to say that a taxpayer is required to hire an appraiser, which petitioner thought would be unconstitutional. We need not consider the constitutional question because an independent appraisal is not required. The cost of actual repairs or a competent appraisal by the taxpayer are acceptable as evidence of the loss. Sec. 1.165-7(a)(2), Income Tax Regs.; Keith v. Commissioner,52 T.C. 41↩ (1969).
5. Checks and receipts totaling considerably more ($ 6,217.18) were introduced into evidence. Petitioner admitted that certain checks and receipts might not be for materials used in renovation, but our finding that the losses sustained amounted to only $ 1,750 obviates an inquiry for further basis. ↩
6. See Shillito Realty Co. v. Commissioner,8 B.T.A. 665 (1927) (additions to building made in remodeling had a depreciable life equal to the remaining life of the building of which they were an inseparable part), affd. without discussion of this point 39 F.2d 830↩ (6th Cir. 1930).